IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBIN JAMES LEPAGE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 04-0261-E-BLW |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM DECISION** |
| STATE OF IDAHO and TOM | ) | **AND ORDER** |
| BEAUCLAIR, Director of the Idaho | ) | |
| Department of Correction, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

Before the Court is Respondents' Motion for Summary Dismissal of Petitioner's Second Petition for Writ of Habeas Corpus. Petitioner has responded to the Motion, and the matter is now ripe for a decision.

After reviewing the parties' briefing and the written record, the Court has determined, for the reasons that follow, that Petitioner has not satisfied the standards that would permit him to proceed with a second or successive habeas petition. Therefore, Respondents' Motion for Summary Dismissal will be granted.

## BACKGROUND

In 1978, Petitioner Robin LePage was convicted of first-degree murder for the shooting death of Kurt Cornelison near Blackfoot, Idaho. Because LePage now alleges that new DNA evidence proves that he is actually innocent of this offense, the facts and procedural history will be recited in detail.

A.      Statement of Facts

In July 1977, LePage, who was then twenty-two years old, was temporarily residing at the State Hospital South in Blackfoot, where he was awaiting the completion of a competency evaluation for pending criminal proceedings. There he met and befriended sixteen-year-old John Messinese. *State's Lodging A-6*, p. 505. In the early afternoon of July 23, Messinese and LePage escaped the State Hospital, immediately cruising through the streets and alleys of Blackfoot looking for a car to steal. *State's Lodging A-6*, pp. 506-07. After LePage had rummaged through a pickup truck, Messinese noticed, for the first time, the outline of a handgun hidden under his shirt. *State's Lodging A-6*, p. 511.

In an attempt to finance their getaway, LePage decided to burglarize a business in Blackfoot. After the burglary was complete, the pair eventually made their way to a nearby area known as "Jensen's Grove," where teenagers and young adults had gathered for a beer party. *State's Lodging A-6*, p. 513. Once there, Messinese claimed that he and LePage separated for a period of time, and he was unaware of LePage's whereabouts until his attention was drawn to a heated exchanged between LePage and another individual. *State's Lodging A-6*, pp. 517-18. Messinese would later claim that the other individual was the victim in this case, Kurt Cornelison. *State's Lodging A-6*, p. 519. LePage and Cornelison continued their verbal quarrel for a few moments, but they separated without resorting to violence.

Messinese and LePage thereafter left Jensen's Grove, wandered onto the premises

**Memorandum Decision and Order - 2**

of the Valley Equipment Company, and stole a white International Harvester pickup truck. They left town that night in the stolen truck. *State's Lodging A-6*, pp. 523-24. A short distance outside of Blackfoot, while LePage was driving and Messinese was in the passenger seat, they encountered a hitchhiker. LePage suddenly shouted "there's that son of a bitch" and jumped out of the truck while it was still moving. Messinese grabbed the wheel, slid over into the driver's seat, and attempted to regain control of the vehicle. After he had managed to turn the truck around, he heard a gunshot, saw a muzzle flash, and watched as hitchhiker "lunged backwards like he was picked up and thrown." *State's Lodging A-6*, pp. 525-28.

    Messinese stopped the truck and went over to the area. The hitchhiker was Kurt Cornelison, who was now lying, apparently dead, on the roadside. When Messinese would not assist LePage in putting the body into the truck's bed, LePage called him a "useless ass" and hoisted the body into the bed himself. He then ordered Messinese to crouch on the floorboard in the front seat. *State's Lodging A-6*, pp. 526-27.

    LePage drove down winding and gravel roads before pulling to a stop and getting out. *State's Lodging A-6*, p. 538. Messinese, still squatting on the floorboard, soon felt someone climb into the bed of the truck, which was followed by rhythmic rocking motion that continued for the next ten to fifteen minutes. *State's Lodging A-6*, pp. 539-40. During that time, Messinese smoked a couple of cigarettes and tossed some trash out of the truck's window. Messinese then heard the tailgate open and sensed the removal of a weight from the bed. LePage reappeared on the driver's side. *State's Lodging A-6*, pp.

**Memorandum Decision and Order - 3**

540-41.

      LePage and Messinese made their way out of Idaho and into Montana, where they separated.  Messinese was arrested soon thereafter.  Police officers retrieved a handgun from him, which he claimed LePage had given him, but it was later determined that the weapon did not fire the shot that killed Kurt Cornelison.  *State's Lodging A-6*, p. 497, 564.

      Cornelison's body had been discovered the day after he was murdered, lying on the side of the road with his shirt pulled up and his pants pulled down around his knees.  *State's Lodging A-4*, p. 293.  A pathologist determined that Cornelison died as a result of a single gunshot wound to the head.  *State's Lodging A-4*, p. 318.  The pathologist also discovered a laceration in Cornelison's anus, spermatozoa in his rectal cavity, and bruising on his penis.  *State's Lodging A-4*, pp. 328, 332.

      On July 29, five days after the murder, Messinese told police officers that LePage killed Cornelison in the manner recited above.  He retraced the route that he and LePage followed after their escape, leading to the place where the body was found.  He also showed the officers the trash that he had thrown out of the window of the truck at that location.  *State's Lodging A-6*, p. 548.

      LePage, meanwhile, had eluded immediate apprehension and was working, under an assumed name, on a ranch in Washington.  He was arrested about ten days after Cornelison's death.

      During interrogation, LePage admitted that he escaped from the State Hospital

**Memorandum Decision and Order - 4**

South with Messinese and that they burglarized some businesses along the way, but he denied being involved in the homicide.  When he was told, however, that he hadn't been informed of all of the facts, LePage spontaneously said, "you're going to tell me that I balled the guy," which he clarified that the officers were going to accuse him of committing a sexual assault.  *State's Lodging A-5*, pp. 423-24.  He also volunteered the following information:  he was very familiar with handguns and was a excellent shot; he knew how to smudge his fingerprints so that he wouldn't be connected to a crime scene; if the police had a weapon in their custody it would not be the murder weapon; and, when it was suggested that the shooting might have been accidental, he replied that if he "was going to do something like that [he] would just jump out and shoot somebody before he even knew [he] was there."  *State's Lodging A-5*, p. 424.

      The State ultimately charged LePage with one count of first degree murder for Cornelison's death.  *State's Lodging A-1*, pp. 21-22.

      At trial, in addition to Messinese's testimony implicating LePage, the State called witnesses who corroborated his claim that a party occurred at Jensen's Grove and that Kurt Cornelison was present at that party.  Two witnesses further testified that they saw LePage that day, one of whom was sure that he was present at Jensen's Grove.  *State's Lodging A-7*, p. 722-23, 730.  The State also presented an expert in the analysis of fibers, who testified that woolen fibers from a blanket that was discovered in the stolen truck appeared to be the same as the fibers found on Cornelison's clothing.  *State's Lodging A-5*, pp. 379-80.

**Memorandum Decision and Order - 5**

The State elicited additional incriminating testimony from a county jail inmate, Charles Thompson, who claimed to have overheard a conversation between LePage and a paid jailhouse informant. Thompson testified that he heard LePage say that he had been "burned" on a drug deal with Cornelison, that he had made a mistake in not dumping the body in the river, and that he had washed out the truck's bed. When the informant asked LePage why he left Messinese to be a witness, LePage allegedly replied that he failed "to pull the trigger enough." *State's Lodging A-7*, pp. 347-53.

Finally, the State argued that the presence of sperm in Cornelison's rectum supported Messinese's claim that the truck was rocking back and forth before the body was dumped. Though the murder charge was not dependent upon a finding of a sexual assault, the State contended that the jury could infer from the evidence that LePage abused Cornelison's body in this manner after death. *State's Lodging A-8*, pp. 935-36.

LePage testified in his own defense. He admitted escaping with Messinese, and he acknowledged committing various burglaries along the way, but he denied going to the Jensen's Grove party, meeting Cornelison, or encountering him on the highway and spontaneously shooting him. *State's Lodging A-8*, pp. 853-54. LePage presented no direct evidence that Messinese committed the offense himself; in fact, he admitted that, with the exception of a few hours when he and Messinese were several miles away from the apparent site of the murder, Messinese was essentially with him the entire time. *State's Lodging A-8*, pp. 862-64.

The jury found LePage guilty as charged. *State's Lodging A-1*, p. 102. The state

**Memorandum Decision and Order - 6**

district court imposed a life sentence for murder and added an additional fifteen years for the use of a firearm during the crime. *State's Lodging A-1*, pp. 129-30.

B.  Subsequent Procedural History

LePage appealed to the Idaho Supreme Court, claiming, in pertinent part, that his Sixth Amendment right to counsel was violated when the State solicited an informant to extract incriminating statements from him after counsel had been appointed. In pressing this argument, he relied upon the United States Supreme Court's decision in *Massiah v. United States*, 377 U.S. 201 (1964).

The Idaho Supreme Court agreed that LePage's Sixth Amendment right had been violated, but it declined to reverse the conviction, finding instead the introduction of the tainted evidence was harmless in light of the other evidence of LePage's guilt. *State v. LePage*, 630 P.2d 674, 680-84 (Idaho 1981). The court likewise rejected LePage's subsidiary claims that his counsel was ineffective in failing to file a motion to suppress the jailhouse statements and that the trial court erred in excluding evidence that would have impeached the testifying inmate. *Id*. at 684-85.

In 1982, LePage filed a state Petition for Post-Conviction Relief, claiming that his trial counsel was constitutionally ineffective for the same reasons that the Idaho Supreme Court had rejected, which he later amended to include additional claims of ineffective assistance. *State's Lodging C-1*, p. 1-2. The state district court denied relief, and the Idaho Court of Appeals affirmed. *State's Lodging C-1*, pp. 67-70; *LePage v. State*, 710 P.2d 10 (Idaho Ct. App. 1985).

**Memorandum Decision and Order - 7**

In 1986, LePage filed a federal Petition for Writ of Habeas Corpus in this Court. *See Case No. 86 CV 1126.* In that Petition, LePage contended that the state courts incorrectly applied harmless error analysis to the *Massiah* violation and that he was denied the effective assistance of counsel. He also alleged that the state court did not provide him a fair post-conviction hearing. This Court denied the Petition, and the Ninth Circuit Court of Appeals affirmed. *See LePage v. Arave*, 851 F.2d 251 (9th Cir. 1988).

In 1993, LePage initiated a new round of state court post-conviction proceedings, during which he was permitted to subject the biological material that had been gathered from Cornelison's body to new DNA testing. The results excluded him as the donor of the sperm in Cornelison's anal cavity. *State's Lodging E-1*, p. 93. During these proceedings, LePage suggested that Richard Leavitt, who was then on death row, should be considered an alternative suspect for the murder. Subsequent DNA testing, however, also excluded Leavitt as a donor of the biological material. *State's Lodging F-10*, Exhibit 10.

The state district court ultimately denied LePage's request for a new trial. *State's Lodging E-1*, pp. 93-135. The Idaho Court of Appeals affirmed that decision. *LePage v. State*, 69 P.3d 1064, 1071 (Idaho Ct. App. 2003). The Court of Appeals reasoned that although the new DNA evidence might impeach the State's theory that LePage sodomized Cornelison's body, that theory was collateral to the main issues in the case, and the evidence failed to show that LePage did not kill Cornelison. *Id*. The Idaho Supreme Court declined to review the case. *State's Lodging F-20*.

**Memorandum Decision and Order - 8**

On May 28, 2004, LePage filed a Second Petition for Writ of Habeas Corpus in this Court, raising several claims. Because LePage's first habeas Petition had been decided on the merits long ago, the Court determined that it was without jurisdiction to proceed without prior authorization from the Ninth Circuit Court of Appeals. (Docket No. 4.) LePage requested that authorization, which was granted, and this Court subsequently reopened the case. Respondents have now filed a Motion for Summary Dismissal, arguing that the successive petition must be dismissed.

## STANDARD OF LAW

The Antiterrorism and Effective Death Penalty Act (AEDPA), enacted on April 24, 1996, includes strict limitations on the filing of second or successive habeas petitions. 28 U.S.C. § 2244(a). The circuit court of appeals acts as an initial gatekeeper, determining whether the petitioner has made a prima facie showing that the application satisfies the criteria in 28 U.S.C. § 2244(b). If the appellate court authorizes the petitioner to proceed, the district court will then act as a second gatekeeper, evaluating the petition to determine whether each claim complies with the requirements of § 2244(b). *See* 28 U.S.C. § 2244(b)(4).

The district court must first determine whether any claim has been raised in a previous petition. If so, the claim "shall be dismissed." 28 U.S.C. § 2244(b)(1). A petitioner may proceed with a claim that has not been raised in an earlier petition, but only if the petitioner can show that:

>  (1)   [T]he factual predicate for the claim could not have been discovered

**Memorandum Decision and Order - 9**

>    previously through the exercise of due diligence; and
>
> (2) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).[1]

With these standards in mind, the Court now turns to the claims in the Second Petition for Writ of Habeas Corpus.

## DISCUSSION

The Second Petition includes the following claims:

(1) LePage's constitutional right to due process was violated because state law improperly placed the burden of proof on him during the state court post-conviction proceeding.

(2) The state district court violated LePage's right to due process of law during post-conviction proceedings when it entered judgment in the State's favor, without conducting an evidentiary hearing, despite the presence of disputed issues of material fact.

(3) The new DNA evidence requires this Court to "revisit" LePage's prior constitutional claims, particularly the determination that the *Massiah* violation amounted to harmless error in light of all of the evidence in the case.

(4) Idaho's limitation on discovery during a post-conviction proceeding violated LePage's constitutional right to due process.

(5) The sentencing enhancement for use of a firearm is unconstitutional because LePage did not receive adequate notice.

---

[1] LePage raises no claim that relies upon the retroactive application of a new rule of constitutional law, so the additional exception in § 2244(b)(2)(A) is not applicable.

**Memorandum Decision and Order - 10**

(6)     LePage was unconstitutionally prohibited from raising ineffective assistance of counsel in his first post-conviction petition because the state courts incorrectly applied the doctrine of res judicata to that petition.

(7)     The state courts' decision in *LePage I* and *LePage II* should be overturned.

(8)     LePage was denied his constitutional right to a fair trial because he is actually innocent of murder.

A.     Claims 1-7 Must be Dismissed

The Court can quickly dispose of Claims 1, 2, 4, and 6. In these claims, LePage attempts to constitutionalize the state court post-conviction process by alleging that the imposition of various state court post-conviction procedures violated his federal constitutional rights. Post-conviction procedures are left to the states to design and implement, and though in certain extreme circumstances the application of those procedures may implicate due process rights, such circumstances are not present here. Accordingly, these claims are purely matters of state law and are not cognizable in a federal habeas proceeding. *See Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989).

In Claims 3 and 7, LePage contends that this Court must "revisit" the *Massiah* issue, and his claims of ineffective assistance of counsel, because his newly discovered evidence alters the legal analysis of those claims.[2] These claims are not "new" for purposes of § 2244(b). Rather, LePage is attempting to introduce new *evidence* to collaterally attack the record that previous courts relied upon in resolving old claims on

---

[2] Claim 7–that the state court decisions in *LePage I* and *LePage II* should be overruled–is essentially a restatement of Claim 3 and it will be treated as such.

**Memorandum Decision and Order - 11**

the merits.  This is insufficient to overcome the prohibition on successive claims in § 2244(b)(1).  *See Babbitt v. Woodford*, 177 F.3d 744, 745 (9th Cir. 1999) (noting that "a ground is successive if the basic thrust or gravamen of the legal claim is the same," regardless whether it is supported by a new legal or factual basis).

In Claim 5, LePage contends that his constitutional right to due process of law was violated because he did not receive adequate notice of the sentencing enhancement for use of a firearm.  While this is a new claim because it was not presented in the earlier habeas proceeding, LePage has failed to show that the claim could not have been discovered and raised earlier with the exercise of due diligence.  28 U.S.C. § 2244(b)(2)(B)(i).  LePage was aware of the factual predicate for this claim at the time his sentence was actually enhanced, and yet he waited years to raise the issue.  LePage is also unable to demonstrate that the factual basis of this claim would be sufficient to show by clear and convincing evidence that but for constitutional error no reasonable factfinder would have found him "guilty" of using a firearm.  *See* 28 U.S.C. § 2244(b)(2)(B)(ii).

      B.      <u>Claim 8–Actual Innocence</u>

The heart of LePage's Second Petition is his contention that his conviction and subsequent incarceration are offensive to the United States Constitution because he is actually innocent of the crime of murder.  He bases this claim upon the DNA results that prove he was not the donor of the sperm found in the victim.

The United States Supreme Court has never held that a freestanding claim of actual innocence based upon newly discovered evidence can serve as a basis for habeas

**Memorandum Decision and Order - 12**

relief in a non-capital habeas case. *See Hererra v. Collins*, 506 U.S. 390 (1992) (noting that the standard of proof for a freestanding claim of innocence, even in a capital case, would be "extraordinarily high"). Instead, in *Schlup v. Delo*, 513 U.S. 298 (1995), the Court held a claim of actual innocence is a gateway procedural matter that, if established, allows a district court to hear other procedurally barred habeas claims on their merits. To prove actual innocence under *Schlup*, the petitioner must show that in light of new reliable evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. *Id.* at 328.

*Schlup* was a pre-AEDPA case. It appears that AEDPA, in particular 28 U.S.C. § 2244(b)(2)(B), has altered the *Schlup* standard for successive petitions in two ways: (1) the petitioner must now show that he could not have discovered the factual basis for his claim earlier through the exercise of due diligence, and (2) the petitioner must show that the facts supporting the claim are sufficient to establish by clear and convincing evidence, rather than a preponderance, that but for constitutional error no reasonable factfinder would have found the petitioner guilty. The Supreme Court, however, has not yet directly addressed the interplay between § 2244(b)(2)(B) and *Schlup*. And, in its most recent pronouncement on the issue, the Ninth Circuit did not decide whether AEDPA superceded *Schlup*; instead, it authorized a second or successive petition after finding that the petitioner had presented a prima facie case that satisfied both *Schlup* and § 2244(b)(2)(B). *See Cooper v. Woodford*, 358 F.3d 1117, 1119-20 (9th Cir. 2004) ("[w]e do not for purposes of this order decide whether the *Schlup* standard or the standard of 28

**Memorandum Decision and Order - 13**

U.S.C. § 2244(b)(2)(B) applies").

In this case, it is unclear whether LePage is attempting to raise a freestanding claim of actual innocence, which cannot serve as a basis for habeas relief under existing law, or whether he contends that his alleged innocence allows the Court to hear other, procedurally barred, constitutional claims.  The Court need not resolve the issue; even assuming that LePage has accompanied his claim of actual innocence with additional claims of constitutional error, the Court concludes that he can satisfy neither the *Schlup* standard nor the more exacting standard in § 2244(b)(2)(B)(ii).[3]

LePage's primary contention is that the DNA results undermine the entire testimony of the State's primary witness, John Messinese.  LePage bases this assertion on Messinese's testimony regarding the rocking motion that he allegedly sensed while he sat on the floor in the stolen truck, suggesting a sexual assault, which LePage asserts has now been conclusively disproven.  From that starting point, he contends Messinese's story completely unravels.

LePage greatly overstates his case.  While the new DNA evidence may create some doubt whether LePage sodomized the victim's body, it neither refutes all of Messinese's testimony nor does it tend to prove that LePage is innocent of murder.

As an initial matter, Messinese did not testify that he actually witnessed LePage perform a sexual act on Cornelison, and the abuse had to be inferred from his testimony,

---

[3] For purposes of this analysis, the Court assumes that LePage was diligent in developing the DNA evidence.  28 U.S.C. § 2244(b)(2)(B)(i).  Respondents do not argue to the contrary.

**Memorandum Decision and Order - 14**

the pathologist's findings, and LePage's own pretrial statements to law enforcement officers. The new evidence, therefore, does not necessarily prove that Messinese lied. Though the Court has no doubt that the State wanted to jury to believe that LePage abused the body in a sexual manner, and the State so argued at trial, it is possible that the motion that Messinese felt resulted from any number of activities, sexual or non-sexual, such as, perhaps, LePage's efforts to heave the body out of the truck.

In any event, even if the new evidence does undermine this one aspect of Messinese's testimony, his other testimony was substantially corroborated. Indeed, LePage's own trial testimony paralleled much of Messinese's. They agreed on major details, including that they were looking for a car to steal immediately after their escape, that LePage burglarized a business called Spudnik's, that they stole a pickup from the Valley Equipment Company, that they proceed to Shelley, Idaho, where LePage burglarized other businesses, and that they made their way out of Idaho, through Wyoming, finally reaching their end point together in Montana.

Where the stories diverged, other evidence tended to confirm Messinese's version.

Despite LePage's claim that he did not attend the Jensen's Grove party or that he quarreled with Cornelison at that party, the State called witnesses who verified that a party occurred at that location, on the date that Messinese claimed that it occurred, that Kurt Cornelison was present, and that LePage was also there. *State's Lodging A-7*, p. 722-23, 730. At trial, Messinese was able to describe Jensen's Grove in detail, including the existence of children's playground, a river, a sandy area near a small lake, and a

**Memorandum Decision and Order - 15**

bandstand of some sort. *State's Lodging A-6*, pp. 515-16.  LePage has not offered a plausible explanation for why Messinese would know that a party occurred on that particular day and at that particular place, with Cornelison in attendance, if he had not been there.

Messinese was also able to retrace the route that he and LePage followed, leading ultimately to the place where Cornelison's body was found.  Messinese told police officers about the trash that he had tossed out of the truck's window at that location, which they recovered at the scene.

A State's expert testified that red, white, and blue woolen fibers extracted from a blanket found in the stolen white pickup exhibited the same characteristics as the red, white, and blue woolen fibers found on Cornelison's clothing.  *State's Lodging A-5*, pp. 379-80.  Through this testimony, the State was able to link the murder victim to the stolen truck. In turn, the truck was linked to LePage through his own testimony. *State's Lodging A-8*, p. 860.

Independent evidence also corroborated Messinese's testimony that LePage showed him a roll of money, which he allegedly told Messinese that he took "off the dude," meaning Cornelison. *State's Lodging A-6*, p. 627.  The State presented witnesses who testified that Cornelison flashed a wad of money at the beer party and that he was buying drugs, beer, and snacks for the attendees. *State's Lodging A-7*, pp. 686-88, 733. Further, it can be reasonably inferred that LePage's travels through several states over the course of several days were financed by more than the small amount of cash–about

**Memorandum Decision and Order - 16**

twenty-five to thirty dollars–that he acknowledged he had retrieved during various burglaries along the way.

Finally, LePage's own pretrial statements to police officers were highly incriminating. LePage's spontaneous comment that he would be accused of sexually assaulting Cornelison remains unexplained, but even if this statement were discounted as coincidental or prompted by the officers, his other statements are still indicative of his guilt. Those statements include LePage's boast that he was adept at firing weapons, that he could destroy his own fingerprints, that if the police had a weapon from Messinese it would not be the murder weapon, and that if he were to commit such a crime, he would "just jump out and shoot somebody."[4]

In short, while the newly discovered evidence may create some doubt whether LePage committed a post-mortem sexual assault, it does not tend to exonerate him of murder. Specifically, LePage has not shown that in light of all of the evidence in the record, including the new evidence, it is more likely than not that no reasonable juror would now find him guilty of murder beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327. Because he is not able to satisfy the lower *Schlup* standard, LePage is also unable to

---

[4] The Court has not placed any weight on inmate Charles Thompson's testimony regarding additional incriminating statements that LePage allegedly made while in the county jail. Though evidence that has been taken in violation of a constitutional right may still be probative on the question of factual innocence, the Court is aware that Thompson's credibility could have been impeached at trial, that Thompson later recanted some of his testimony, and that he then altered his earlier recantation. As a result, the Court finds the evidence to be an unreliable indicator of guilt or innocence. *See Schlup*, 513 U.S. at 328 (noting that although a court may consider unlawfully admitted evidence, it must give "due regard" to its unreliability).

**Memorandum Decision and Order - 17**

cross the higher threshold contained in 28 U.S.C. § 2244(b)(2)(B)(ii). Accordingly, he cannot proceed with the Second Petition, and the case will be dismissed.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Respondents' Motion to Take Judicial Notice (Docket No. 18) is GRANTED.

IT IS FURTHER ORDERED that Respondents' Motion for Summary Dismissal (Docket No. 16) is GRANTED.

IT IS FURTHER ORDERED that the Second Petition for Writ of Habeas Corpus is DISMISSED.

DATED: **September 7, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court